2019 IL App (1st) 161417-U

SIXTH DIVISION
November 22, 2019

No. 1-16-1417

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 8249 |
| | ) | |
| JASON STEPHENS, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**O R D E R**

¶ 1   *Held*: The admission into evidence of a trial witness's video-recorded statement, which was substantially the same as properly admitted prior inconsistent statements made during that witness's grand jury testimony, was, if error, harmless. The trial court's failure to substantially comply with Rule 431(b) was not plain error because the the evidence at trial was not closely balanced. The case is remanded for a preliminary *Krankel* inquiry on defendant's post-trial, *pro se*, allegations of ineffective assistance of trial counsel.

¶ 2   A jury found defendant Jason Stephens guilty of the murder of Samuel Coleman, for which he was sentenced to 50 years in prison. On appeal, Mr. Stephens argues that he was denied a fair trial because (1) the prior statements of Rondell Smith, which included Mr. Smith's video-

recorded statement to the police and his grand jury testimony, were erroneously admitted; (2) the trial court failed to substantially comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); and, if the conviction is not reversed, (3) the case should be remanded for a preliminary *Krankel* inquiry into Mr. Stephens's post-trial, *pro se* allegations of ineffective assistance of counsel. For the following reasons, we affirm Mr. Stephens's conviction and remand for the limited purpose of a preliminary *Krankel* inquiry.

¶ 3                                    I. BACKGROUND

¶ 4    During *voir dire*, the trial court in this case asked the potential jurors to raise their hands if they had "a disagreement or a problem" with any of the following propositions: (1) "that when a criminal trial starts, the accused is presumed to be innocent," (2) that someone who has had charges filed against him or her should not have that fact held against them, (3) "that the only way you can be guilty in a criminal case is if the government who brought the charge can prove guilt beyond a reasonable doubt," and (4) "[i]n a criminal case, the accused does not have to prove their innocence," or testify, or "call any witnesses on their own behalf;" "the burden of proof is on the government" to "prove guilt beyond a reasonable doubt." None of the potential jurors raised a hand following the court's recitation of any of these propositions.

¶ 5    A jury was selected and trial began that day. The evidence at trial was that on August 1, 2010, Samuel Coleman was fatally shot inside his home at 12427 South Eggleston Avenue in Chicago. Although there were no eyewitnesses to the shooting itself, during the course of the police investigation one witness, Bernard Franklin, identified Mr. Stephens as having been at Mr. Coleman's house just before Mr. Franklin heard a gunshot and as having walked away from the house shortly after the shot. A second witness, Cordell Warren, testified that someone he did not know but who was consistent with Mr. Stephens's appearance was on Mr. Coleman's porch

before and left the house shortly after the shot. In addition, Mr. Stephens's uncle, Rondell Smith, gave a video-recorded statement to police and also grand jury testimony in which he said that Mr. Stephens confessed to Mr. Smith, shortly after Mr. Coleman was killed, that he shot a drug dealer on the south side of Chicago in the neck. When at trial Mr. Smith recanted this statement, the State introduced both his video-recorded statement and the transcript of his substantially similar grand jury testimony. The introduction of Mr. Smith's two prior statements is the basis for Mr. Stephens's primary challenge on appeal.

¶ 6    Mr. Coleman died of a gunshot wound to his neck on August 1, 2010. He was found "dead on arrival" by paramedics at 12:31 p.m. inside his residence at 12427 South Eggleston Avenue. This was a single-family home with front and side entryways, although there was testimony that the side entryway was boarded up and barricaded. Mr. Coleman had an SKS rifle on his lap, under his right arm, and there was a single gunshot wound to the left side of his neck.

¶ 7    The State first presented the testimony of Candace Brooks, Mr. Coleman's mother, who said she spoke to Mr. Coleman the night before his death. He told her that he loved her and said he "was praying that God would take him out of the life that he was living and he wished he had listened" to his mother.

¶ 8    Bernard Franklin testified that he lived at 12416 South Eggleston Avenue and that he went to see Mr. Coleman, "every day, just to check on him, see how he [was] doing." When Mr. Franklin arrived at about 10 or 11 a.m. on August 1, 2010, he saw "at least five people" in the house, hanging out in the kitchen area. He recognized some of them but did not recognize one man whom he described by saying, "[a]ll I can remember is the limp." Mr. Franklin went right to Mr. Coleman's room and hung out with him there. Mr. Franklin said "[n]othing" happened in Mr. Coleman's room. Mr. Coleman did not seem upset or distraught, and did not suggest he was

arguing with anyone. Mr. Franklin did not stay for long, and when he left, the other five people were still there.

¶ 9    Mr. Franklin was on his own porch when, sometime later, he saw a few people leaving Mr. Coleman's house. Mr. Franklin believed that the man with the limp and one other person remained at Mr. Coleman's house at that point. Mr. Franklin's attention was then drawn back to Mr. Coleman's house because he heard what he thought was a fire cracker coming from that direction. Shortly after that, Mr. Franklin saw "[t]he guy with the limp" leaving Mr. Coleman's house. Mr. Franklin went back inside his house and came out again about 20 minutes later. The police had arrived and it was only then that he learned that Mr. Coleman had been shot. At that time, Mr. Franklin did not tell the police what he had seen.

¶ 10   On September 11, 2010, in an interview with police, Mr. Franklin identified a photo of Mr. Stephens as the unknown person with the limp that he had seen at Mr. Coleman's house the morning of August 1, 2010. The parties also stipulated that he identified the photo as the man he had seen when he testified before the grand jury. At trial, however, when Mr. Franklin was shown the photograph of Mr. Stephens that he had been shown before the grand jury, Mr. Franklin said that he "d[idn't] look familiar."

¶ 11   Over defense counsel's objection, the State published a video-recorded statement Mr. Franklin had given on January 6, 2014, which differed from his trial testimony in that in the video-recorded statement, Mr. Franklin said that there were only three other people besides Mr. Coleman at the house when he was there, instead of the five people he had said were there at trial. He also gave a more detailed description of the man that he later identified as Mr. Stephens in that statement, describing him as "dark skin, kinda chubby, with a limp, face kinda fat." In addition, in his video-recorded statement, Mr. Franklin also said that he saw the two people he

knew leave, using the side entrance, about seven or eight minutes after he left Mr. Coleman's house and about five minutes before he heard the gunshot. No objection is raised on appeal to the admission of Mr. Franklin's video-recorded statement.

¶ 12    Cordell Warren testified that he and a friend were doing some work at the house of Steven Smith, Mr. Coleman's father, which was near the house on Eggleston Avenue where Mr. Coleman was shot, on the morning of August 1, 2010. Mr. Warren saw someone standing on the porch of the house where Mr. Coleman was shot who he described as "short and kind of heavyset," wearing blue jeans and a sleeveless white "wife beater" shirt. Mr. Warren never saw that man enter the house and never saw his face. When he was in the back of Steven Smith's house, he heard a shot that he assumed at the time was a firecracker. When he later returned to the front of Steven Smith's house, Mr. Warren saw a man—who was wearing what looked like the same clothing as the man he had previously seen on the porch—walking down the street, though he could not "say for sure if that was the same person."

¶ 13    Mr. Warren admitted on cross-examination that he had a history of selling drugs, but denied using drugs beyond smoking marijuana. He admitted to one prior conviction for drug delivery and said that he could not remember another one. He acknowledged that he was on drug-treatment probation at the time of trial.

¶ 14    The State put into evidence a video-recorded statement by Mr. Stephens's uncle, Rondell Smith, that he had given on October 11, 2010, over defense counsel's objection. In that statement, Mr. Smith identified a photograph of Mr. Stephens as his nephew. Mr. Smith said that both he and Mr. Stephens were in Minnesota in September 2010, together at a friend's watching the Bears-Detroit football game. Mr. Stephens told Mr. Smith that he had been robbed by someone in whose territory he had been selling drugs, that he had gone to that person's house

and unsuccessfully tried to get his money back, and that the encounter ended with Mr. Stephens taking a gun, hitting the person across the head with it, and then shooting him in the neck.

¶ 15    In his trial testimony, Mr. Smith confirmed that the video recording was an accurate recording of what he had said, but maintained that what he said on that video was not true. He testified at trial that Mr. Stephens was not with him watching the Bears game in Minnesota in September 2010 and that what he had said about Mr. Stephens's supposed admission to shooting someone was untrue. Mr. Smith's explanation was that his family had been "going through financial problems," his parents had recently passed away, and he "was emotional" and was saying things that were not true. On cross-examination during his trial testimony, Mr. Smith added that, when he gave the October, 11, 2010, video-recorded statement, he was in custody in St. Paul, Minneosta, with three other men due to a false accusation by Mr. Stephens. According to Mr. Smith, he made up the false statement about Mr. Stephens to retaliate and to get out of jail.

¶ 16    The State also published the transcript of Mr. Smith's grand jury testimony. That testimony was similar to what he said in his October 11, 2010, video-recorded statement. In his grand jury testimony, Mr. Smith had identified a photograph of Mr. Stephens and testified that Mr. Stephens told him that he had been "hustling," or selling drugs, in someone else's territory. The person whose territory it was told Mr. Stephens that he could not sell there, then robbed Mr. Stephens. Mr. Stephens told Mr. Smith that he "came back like two days later *** with a gun, *** shot him in the neck and he ran off. He didn't see him when he fell. He just ran off. He didn't know he killed him or not. He got shot in the neck."

¶ 17    The parties stipulated that, if called, investigator Jamia Newell would testify that, along with defense counsel, she interviewed Mr. Smith outside his home in St. Paul and at that time

6

Mr. Smith stated that while he was in jail in October 2010, he was able to communicate with his brother-in-law "via chuckholes in the cells" and that his brother-in-law had "told him to tell the St. Paul police that he had information regarding [Mr. Stephens] and a shooting in Chicago."

¶ 18    Detective James Braun was assigned to Mr. Coleman's homicide investigation. Detective Braun interviewed Mr. Smith twice in the course of his investigation and transported Mr. Smith to the courthouse to testify before the grand jury. Detective Braun described Mr. Smith as "[v]ery willing" to be interviewed and said that Mr. Smith did not appear scared or frightened. The detective also said that, to his knowledge, the fact that Mr. Coleman was shot in the neck was not something that would have been known publicly.

¶ 19    Detective Braun testified at trial that he had interviewed Mr. Stephens twice, the first time in December 2010 and the second time in April 2014. The first interview was audio-recorded and the second was video-recorded. The State played portions of both of Mr. Stephens's statements at trial.

¶ 20    In his April 2014 video-recorded statement, Mr. Stephens admitted to being present at Mr. Coleman's residence at the time of the shooting, but said he "didn't kill nobody," and initially said he was outside of the gate when the shot went off, feeding a dog that was chained to the fence. Mr. Coleman had asked Mr. Stephens to step out because the person who Mr. Coleman was selling drugs for, the big marijuana supplier for the area, had arrived. According to Mr. Stephens, he heard the shot, a "dude ran out," and he observed Mr. Coleman lying on the floor, at which point Mr. Stephens said he "took off." Mr. Stephens described the man who had run out as a "guy with dreads" and dark skin, whose name was either "Kurt" or "Chris, or something like that." Mr. Stephens said that this man fled by "hopp[ing] the gate" and running south down the street.

7

¶ 21    Later in his interview, Mr. Stephens described the man who had run as "dark skinned" and said that he drove away in a grey Range Rover. At one point he identified this man as "Sherman" and later as either "Sherman Davis" or "Christopher Davis"; he could not remember the name. Even further into the interview, Mr. Stephens said he had been in the house, "just chilling," when someone came to the door, and that individual and Mr. Coleman got into an argument. Mr. Coleman owed the individual money. Mr. Stephens agreed that one of the doors to the house was barricaded, and the house only had one working entrance. Mr. Stephens said he stayed inside the house on a stairwell by the barricaded door. He heard the shot, saw a man take off, then saw Mr. Coleman and ran.

¶ 22    In the 2010 interview, Mr. Stephens said that he and Mr. Coleman were together when "a guy came knocking on the door." Mr. Stephens took off running down the side stairs. Mr. Stephens heard the man and Mr. Coleman were arguing about money, the man had come to collect money for a third person, then Mr. Stephens heard a shot, he took off, and "that was it." Mr. Stephens later said that the other man left first while Mr. Stephens remained hiding behind a curtain on the side stairs, and then eventually Mr. Stephens looked out, saw Mr. Coleman lying on the floor and called his name, and when Mr. Coleman did not respond, Mr. Stephens took off running because he assumed Mr. Coleman was dead. Mr. Stephens insisted he would not take his friend's life and said that Mr. Coleman was "his best homey." In that interview, Mr. Stephens said the man he had seen was named "Insane."

¶ 23    On cross-examination, Detective Braun acknowledged that in each of his interviews, Mr. Stephens had repeatedly denied being the shooter and had told the detective that he was scared because the man that he believed had shot Mr. Coleman had seen his face.

¶ 24    The State presented forensic evidence through both live testimony and party stipulations.

An assistant medical examiner testified that Mr. Coleman's gunshot wound had "stippling" but no soot, which suggested that the gun was shot from "intermediate range," or from about "half a foot to about two, two and a half feet" away. A gunshot residue test was performed on Mr. Coleman and revealed that he "may not have discharged a firearm with either hand, and if he did discharge a firearm, then the particles were removed by activity, were not deposited or were not detected by the procedure." The bullet that was retrieved from Mr. Coleman's neck was not fired by the rifle he was found with. No fingerprints were found on anything recovered from the crime scene.

¶ 25    When the State rested its case-in-chief, the defense reasserted its objection to the video-recorded statements of Mr. Franklin and Mr. Smith. The court responded:

> "Those objections were timely made at a side bar. We talked about it. I thought, based on the way they testified, that [the] videos should come in because they were as elusive and difficult in denying certain things on the witness stand; that it was only fair to let the jury see what they said originally and the manner in which they said it. So, your objection is noted. It was timely made yesterday. It's still denied."

¶ 26    The defense then moved for a directed finding, which the court denied, introduced some photographic exhibits, and rested.

¶ 27    During deliberations, the jury asked to see Mr. Smith's grand jury testimony. The defense objected, but the court overruled that objection. The jury later requested the full video recording of Mr. Smith's statement and not just the portions that had been played at trial. According to the court, certain portions had been edited out when played for the jury so the court responded, with all parties in agreement, "[y]ou've received all of the exhibits which [were] admitted into evidence at the trial. Do not concern yourselves with why the entire exhibit was not available.

Please, continue deliberations."

¶ 28    The jury found Mr. Stephens guilty of first-degree murder, in that he personally discharged a firearm that proximately caused the death of another individual.

¶ 29    During post-trial proceedings, on a day that Mr. Stephens's trial attorney was not present due to a conflict, Mr. Stephens asked and was allowed to address the court as follows:

> "[MR. STEPHENS]: During the trial I asked my lawyer to go with a bench and she advised me and told me she's been working here for 25 years. She knows better than I know. Last time, and every time, I asked her to go with a bench. She told me to go with a jury. I just felt it in my heart to go with a bench. She kept telling me no. At the time I told her, look, I'm going to ask you. She told me I am going with no vibes. You are going to mess this up. When I talk [to] her on the phone, she tells me the same thing.
>
> THE COURT: This is a conversation that you need to have with her. You are getting into some—what would characterize, what I call a *Krankel* hearing, when you get into complaints about how your lawyer helped you out. I need to have her here to have this conversation with you."

¶ 30    The court continued the case and said, "let [defense counsel] know there may be a *Krankel* hearing. She should be prepared to talk about that." No *Krankel* hearing or other inquiry into Mr. Stephens's allegations was ever held.

¶ 31    On April 19, 2016, the trial court denied Mr. Stephens's post-trial motion and sentenced him to 50 years in prison.

¶ 32                                    II. JURISDICTION

¶ 33    Mr. Stephens timely filed his notice of appeal on April 28, 2016. This court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI,

§ 6) and Illinois Supreme Court Rules 603 and 606, governing appeals from final judgments of conviction in criminal cases (Ill. S. Ct. R. 603 (eff. Feb. 6, 2013), R. 606 (eff. Dec. 11, 2014)).

¶ 34                                III. ANALYSIS

¶ 35    On appeal, Mr. Stephens argues that the trial court erred by (1) allowing inadmissible prior statements from Mr. Smith, the "State's key witness," to be "repeatedly presented to the jury as substantive evidence" of Mr. Stephens's guilt and to be "improperly admitted as impeachment evidence" because the statements substantially prejudiced Mr. Stephens; (2) failing to properly admonish jurors pursuant to Illinois Supreme Court Rule 431(b); and (3) failing to conduct a preliminary *Krankel* inquiry into Mr. Stephens's allegations of ineffective assistance of counsel. We consider each issue in turn.

¶ 36              A. Prior Inconsistent Statements of Mr. Smith

¶ 37    Mr. Stephens first argues that the trial court erred in allowing Mr. Smith's video-recorded statement and the transcript of his grand jury testimony to be admitted as substantive evidence at trial.

¶ 38    The parties agree that this claim is governed in part by section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2014)). That provides that a witness's prior statement is not inadmissible hearsay if:

> "(a) the statement is inconsistent with his testimony at the hearing or trial, and
>
> (b) the witness is subject to cross-examination concerning the statement, and
>
> (c) the statement—
>
> > (1) was made under oath at a trial, hearing, or other proceeding, or
> >
> > (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

* * *

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." *Id.*

¶ 39 We review evidentiary rulings, including whether a prior inconsistent statement was properly admitted into evidence, for an abuse of discretion. *People v. Torres*, 2012 IL 111302, ¶ 46. "The trial court abuses its discretion if its determination is arbitrary, fanciful, unreasonable, or when no reasonable person would take the same view." *People v. Campbell*, 2015 IL App (1st) 131196, ¶ 25.

¶ 40 We first consider the propriety of admitting Mr. Smith's grand jury testimony as substantive evidence. Because we find that this testimony was properly admitted under section 115-10.1, we find that any error in admission of the video-recorded statement was harmless.

¶ 41 The State argues that Mr. Stephens has forfeited any objection to the admission of Mr. Smith's grand jury testimony because he made no objection at trial. Mr. Stephens responds that we can review this as plain error. See *People v. Wooden*, 2014 IL App (1st) 130907, ¶ 10 (errors rising to the level of plain error may still be considered on appeal, even where no objection has been made). However, "without error, there can be no plain error." *People v. Johnson*, 238 Ill. 2d 478, 484 (2010). We find the grand jury testimony was properly admitted under section 115-10.1 and thus there is no error, plain or otherwise.

¶ 42 Mr. Stephens does not dispute that Mr. Smith's grand jury testimony meets the requirements of section 115-10.1(b)—that Mr. Smith was subject to cross-examination about his statement—and (c)(1)—that his statement was made under oath at a hearing or another proceeding. 725 ILCS 5/115-10.1(b), (c)(1) (West 2014). Rather, Mr. Stephens argues that the

State failed to lay a proper foundation from which it could be determined, as required by section 115-10.1(a) of the Code (725 ILCS 5/115-10.1(a) (West 2014)), that Mr. Smith's grand jury testimony was in fact "inconsistent" with his trial testimony.

¶ 43 It is of course true that a "proper foundation must be laid before prior inconsistent statements are allowed into evidence." *People v. Hallbeck*, 227 Ill. App. 3d 59, 62 (1992). As we have said, "[t]he witness must have an opportunity to explain the inconsistency before the introduction of extrinsic evidence of the [prior] statement." *Id*. This "prevents unfair surprise and gives the witness an opportunity to explain the inconsistency." *Id.* For purposes of section 115-10.1(a), however, "the definition of inconsistency does not require a direct contradiction, but only a tendency to contradict the witness's present testimony." *People v. Lee*, 243 Ill. App. 3d 745, 749 (1993). And "[a]lthough only the inconsistent portions of a prior statement are admissible, a trial court need not make a quantitative or mathematical analysis of whether a witness's entire statement is inconsistent under section 115-10.1 for the entire statement to be admissible." (Internal quotation marks omitted.) *People v. Harvey*, 366 Ill. App. 3d 910, 922 (2006).

¶ 44 Here, it is clear that Mr. Smith's grand jury testimony directly contradicted his trial testimony in the most crucial aspects. Before the grand jury, Mr. Smith testified that in September 2010, he was in Minnesota watching a Bears game at a Mr. Moore's house along with Mr. Stephens, he and Mr. Stephens had a conversation about "what happened in Chicago," and Mr. Stephens said he shot a man in the neck on the south side, around 124th Street and Eggleston Avenue. At trial, Mr. Smith testified that he did not see Mr. Stephens while in Minnesota in September 2010, Mr. Stephens was not with him watching a Bears game, and, most significantly, Mr. Stephens did not tell him that he had shot someone in the neck in Chicago. He also claimed

that what he had told the assistant state's attorney before the grand jury had been a lie.

¶ 45    Mr. Stephens argues that the only foundational information that the State elicited at trial was that his grand jury testimony was a lie. However, while much of the foundational trial testimony occurred during the State's questioning about Mr. Smith's video-recorded statement, the State elicited the fact that Mr. Smith had previously said that he saw Mr. Stephens in Minnesota, watched the Bears game with him, and had a conversation about Mr. Stephens shooting someone in the neck. Mr. Smith was given ample opportunity at trial to explain these inconsistencies. We find that the State sufficiently established that Mr. Smith's trial testimony was inconsistent with his grand jury testimony as required by section 115-10.1 of the Code, and the trial court properly admitted Mr. Smith's grand jury testimony as substantive evidence at trial.

¶ 46    Mr. Stephens cites *People v. Redd*, 135 Ill. 2d 252 (1990), and *People v. Cooper*, 210 Ill. App. 3d 427 (1991), in support of his argument that the grand jury testimony was improperly admitted. In *Redd*, a witness at trial invoked his fifth amendment privilege against self-incrimination while testifying and the State introduced that witness's grand jury testimony as substantive evidence pursuant to section 115-10.1 of the Code. *Redd*, 135 Ill. 2d at 301. On appeal, our supreme court found that the grand jury testimony was improperly admitted as substantive evidence, noting that at trial the witness "did not respond [] willingly to questions," "neither admitted nor denied the content of his testimony before the grand jury," "was not in a position where he [could] explain an earlier position and be cross-examined as to both his present and earlier positions," did not acknowledge that the transcript he was confronted with contained an accurate description of his grand jury testimony, and "could not be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in

14

question." (Internal quotation marks omitted.) *Id*. at 312. Our supreme court determined that under these circumstances, the witness's refusal to testify could simply not be considered inconsistent as required by section 115-10.1. *Id.*

¶ 47    Here, in contrast to *Redd*, Mr. Smith did not refuse to testify at trial but testified differently than he had to the grand jury. Mr. Stephens argues that this court in *Cooper*—which also involved a witness who invoked the fifth amendment privilege at trial (*Cooper*, 210 Ill. App. 3d at 436)—determined that the supreme court's holding in *Redd* "was not limited to Fifth Amendment assertion cases." That is not correct. In *Cooper*, we relied expressly on our supreme court's recognition in *Redd*, that an assertion of privilege at trial is not a statement that is inconsistent with grand jury testimony and noted that this distinction is not limited to "instances *where the assertion of the privilege was valid*." (Emphasis added.) *Id.* at 437. Neither *Cooper* nor *Redd* have any bearing on our ruling here.

¶ 48    Mr. Stephens also argues that Mr. Smith's video-recorded statement was improperly admitted as either substantive evidence or impeachment evidence. Under section 115-10.1 of the Code, a video-recorded statement that was not given under oath is not admissible, even if it is inconsistent, unless it "narrates, describes, or explains an event or condition of which the witness had personal knowledge." 725 ILCS 5/115-10.1(c)(2) (West 2014). Mr. Smith's video-recorded statement did not address anything about which Mr. Smith had personal knowledge. The State properly concedes that this video-recorded statement would not be admissible under section 115-10.1.

¶ 49    The State argues that Mr. Stephens nonetheless forfeited this issue because, while he objected and preserved his objection to this testimony in his post-trial motion, he did not make the same arguments that he makes on appeal. However, a party forfeits issues, not arguments.

*Brunton v. Kruger*, 2015 IL 117663, ¶ 76. We see no forfeiture here.

¶ 50    The State also argues that this evidence was properly admitted as impeachment evidence because Mr. Smith's trial testimony affirmatively damaged the State's case. See *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 48-49 (the prior inconsistent statement was admissible as impeachment evidence because, even if it was not based on personal knowledge, it affirmatively damaged the State's case). Mr. Stephens counters that merely recanting a prior helpful statement is not affirmative damage. But we need not decide whether the video-recorded statement was properly admitted as impeachment testimony because any error in its admission was harmless. "An error is harmless where there is no *reasonable probability* that the jury would have acquitted the defendant absent the error." (Internal quotation marks omitted and emphasis in original.) *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 55.

¶ 51    "This court has repeatedly held that the erroneous admission of a prior inconsistent statement is harmless where it is cumulative to properly admitted evidence." *People v. Wesley*, 2019 IL App (1st) 170442, ¶ 28; see also, *e.g.*, *People v. French*, 2017 IL App (1st) 141815, ¶ 44; *Wilson*, 2012 IL App (1st) 101038 ¶¶ 56-68; *People v. Harvey*, 366 Ill. App. 3d 910, 921-22 (2006) (finding the same). In this case, Mr. Smith's grand jury testimony was properly admitted as substantive evidence pursuant to section 115-10.1. His video-recorded statement was substantially similar to his grand jury testimony and thus cumulative to properly admitted evidence. The admission of the video-recorded statement, if erroneous, was harmless error.

¶ 52        B. The Trial Court's Failure to Comply with Rule 431(b) is Not Plain Error

¶ 53    Mr. Stephens next argues that the trial court failed to substantially comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Mr. Stephens concedes that he forfeited this issue by failing to timely object or raise it in his post-trial motion (*Johnson*, 238 Ill. 2d at 484) but

argues that it may be reviewed as plain error. The plain error doctrine allows a court to review an unpreserved error when a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant" or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48. Mr. Stephens argues that this issue can be reviewed under the first prong of the plain error doctrine.

¶ 54    We agree with Mr. Stephens that the trial court committed error by failing to substantially comply with Rule 431(b). That rule requires a trial court to "ask each potential juror, individually or in a group, whether that juror understands and accepts" four principles, including that the defendant is presumed innocent. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The trial court in this case addressed each of these four principles with the potential jurors, but rather than separately asking whether the jurors understood and accepted each of the principles, the court asked whether they had "a disagreement or a problem" with any of the principles. Our supreme court in *Sebby* found substantially the same questioning by the trial court in that case to be "clear error." *Sebby*, 2017 IL 119445, ¶ 49; see also *People v. Wilmington*, 2013 IL 112938, ¶ 32 (finding "the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself" (emphasis in original)).

¶ 55    We nonetheless find that the error does not rise to the level of plain error in this case, as the evidence at Mr. Stephens's trial was not closely balanced. One witness identified Mr. Stephens and another identified an individual with an appearance consistent with Mr. Stephens's as having been around Mr. Coleman's house before and just after the gunshot was heard by these witnesses. Mr. Smith testified before the grand jury that Mr. Stephens told him, approximately

17

one month after Mr. Coleman was shot, that he had shot a drug dealer in the neck on the south side of Chicago near 124th Street and Eggleston Avenue. There was testimony that Mr. Coleman was dealing drugs and the murder occurred at 124th Street and Eggleston Avenue. Detective Braun testified that, to his knowledge, the fact that Mr. Coleman was shot in the neck was not public information. Moreover, Mr. Stephens himself told the detectives he was at Mr. Coleman's house at the time of the shooting, although he denied being the shooter. In addition, Mr. Stephens's statements to the police about what he observed the morning of August 1, 2010, were painfully inconsistent. Taking all of this into consideration, we cannot say that the evidence against Mr. Stephens was so closely balanced that the court's failure to comply with Rule 431(b) "threatened to tip the scales of justice against" Mr. Stephens. *Sebby*, 2017 IL 119445, ¶ 48. Accordingly, we find no plain error.

¶ 56          C. The Case is Remanded for a Preliminary *Krankel* Inquiry

¶ 57    Lastly, Mr. Stephens argues, and the State correctly concedes, that this case must be remanded to the trial court for a preliminary *Krankel* inquiry. "Through *People v. Krankel*[, 102 Ill. 2d 181 (1984),] and its progeny, the Illinois Supreme Court has provided our trial courts with a clear blueprint for the handling of post-trial, *pro se* claims of ineffective assistance of counsel." *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 70. Where, as here, a defendant presents such a claim, the trial court should first examine its factual basis (*People v. Moore*, 207 Ill. 2d 68, 77-78 (2003)) by conducting a preliminary *Krankel* inquiry. If the trial court determines that the claim is meritless or pertains only to trial strategy, the court may deny the *pro se* motion and the inquiry is over; but if the court finds there was "possible neglect of the case," then it should appoint new counsel. *Id.* at 78.

¶ 58    Here, Mr. Stephens clearly expressed his discontent with his trial counsel's representation

18

after trial and prior to sentencing, saying that he had wanted a bench trial and she advised him to go with a jury trial. The trial court even recognized that Mr. Stephens was "getting into *** a *Krankel* hearing." The court said the issue would be taken up later because Mr. Stephens's trial counsel was not present at that time, but no preliminary *Krankel* inquiry was ever held.

¶ 59    In *Moore*, our supreme court said that "[t]he law requires the trial court to conduct some type of inquiry into the underlying factual basis, if any, of a defendant's *pro se* post[-]trial claim of ineffective assistance of counsel." *Id.* at 79. Because no such investigation occurred in this case, we must remand it to the trial court for this limited purpose.

¶ 60                                   VI. CONCLUSION

¶ 61    The admission of Mr. Smith's grand jury testimony was proper, and the admission of his video-recorded statement was therefore harmless error. Although the trial court did not comply with Rule 431(b), this did not rise to the level of plain error because the evidence at trial was not closely balanced. We remand this case for the limited purpose of allowing the trial court to conduct a preliminary *Krankel* inquiry.

¶ 62    Conviction affirmed; remanded with directions.