2022 IL App (1st) 201252-U

SIXTH DIVISION
March 25, 2022

No. 1-20-1252

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 8249 |
| | ) | |
| JASON STEPHENS, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**O R D E R**

¶ 1    *Held*: The trial court's dismissal of defendant's *pro se* ineffective assistance of trial counsel claims after a *Krankel* inquiry are affirmed. The trial court was not required to question counsel about every claim defendant raised and the inquiry made was sufficient.

¶ 2    A jury found defendant Jason Stephens guilty of the murder of Samuel Coleman and additionally found that he personally discharged the firearm that proximately caused Mr. Coleman's death. Mr. Stephens was sentenced to 50 years in prison. Mr. Stephens now appeals from the trial court's dismissal of his *pro se* claim of ineffective assistance of counsel following a

preliminary inquiry made pursuant to *People v. Krankel*, 102 Ill. 2d 181, 189 (1984). On appeal, Mr. Stephens's sole contention is that the trial court's method of conducting the *Krankel* inquiry was improper, as the court failed to ask defense counsel about Mr. Stephens's specific claim that counsel failed to investigate and call seven witnesses who were at Mr. Coleman's home on the day of the shooting. For the following reasons, we affirm.

¶ 3                                                    I. BACKGROUND

¶ 4       We provided a detailed recitation of the evidence presented at trial in our decision on direct appeal. *Stephens*, 2019 IL App (1st) 161417-U. We recount below only those facts necessary for an understanding of the issue raised in this appeal.

¶ 5       The evidence at trial was that on August 1, 2010, Samuel Coleman was fatally shot inside his home at 12427 South Eggleston Avenue in Chicago. Mr. Coleman died of a gunshot wound to his neck on August 1, 2010, and was found "dead on arrival" by paramedics at 12:31 p.m. inside his residence. Mr. Coleman had an SKS rifle on his lap, under his right arm, and there was a single gunshot wound to the left side of his neck.

¶ 6       Although there were no eyewitnesses to the shooting itself, during the police investigation one witness, Bernard Franklin, who lived near Mr. Coleman, testified that he was at Mr. Coleman's house on the morning of the shooting and saw "at least five people" there, including one whom he did not recognize and described as having a limp. Mr. Franklin said that later he was on his own porch when he saw a few people leaving Mr. Coleman's house, but not the man with the limp. Mr. Franklin testified he heard a gunshot and shortly after that he saw the man with the limp walking away from the house. Mr. Franklin identified Mr. Stephens as the man with the limp from a photograph, both to the police and before the grand jury.

¶ 7       A second witness, Cordell Warren, testified that someone he did not know but who was

consistent with Mr. Stephens's appearance was on Mr. Coleman's porch before and left the house shortly after the shot.

¶ 8      In addition, Mr. Stephens's uncle, Rondell Smith, gave a video-recorded statement to police and also grand jury testimony in which he said that Mr. Stephens confessed to him, shortly after Mr. Coleman was killed, that he had shot a drug dealer in the neck on the south side of Chicago. When at trial Mr. Smith recanted this statement, the State introduced both his video-recorded statement and the transcript of his substantially similar grand jury testimony.

¶ 9      The State also introduced portions of two interviews the police conducted with Mr. Stephens, one audio-recorded in December 2010 and one video-recorded in April 2014. In both interviews, Mr. Stephens admitted to being present at Mr. Coleman's residence at the time of the shooting, but maintained he was not the shooter. The remaining details provided by Mr. Stephens in those interviews were, however, extremely inconsistent. Mr. Stephens alternately said he was feeding a dog outside of Mr. Coleman's home when the shot went off, that he was inside the house "just chilling" when someone came in and began arguing with Mr. Coleman and he heard the shot from inside the house, and that he took off running when a "guy came knocking on the door." Throughout the two interviews, Mr. Stephens also said the name of the shooter was "Kurt" or "Chris," "Sherman Davis" or "Christopher Davis," and "Insane." On cross-examination, the detective who introduced Mr. Stephens's statements at trial acknowledged that, in each interview, Mr. Stephens repeatedly denied being the shooter and said he was scared because he believed the shooter had seen his face.

¶ 10     The jury found both that Mr. Stephens was guilty of first degree murder and that he had personally discharged the firearm that proximately caused the death of Mr. Coleman. During post-trial proceedings, on a day that Mr. Stephens's trial counsel was not present due to a conflict, Mr.

Stephens informed the court that he had told his lawyer he wanted a bench rather than a jury trial but that his lawyer told him to "go with a jury." The court responded that Mr. Stephens was "getting into *** what I call a *Krankel* hearing, when you get into complaints about how your lawyer helped you out. I need to have her here to have this conversation with you." The court then continued the case and said, "let [defense counsel] know there may be a *Krankel* hearing. She should be prepared to talk about that." The court did not hold a *Krankel* hearing or make any other inquiry into Mr. Stephens's allegation until this court remanded the case following a direct appeal.

¶ 11    Mr. Stephens argued in that appeal that the trial court erred by allowing what he alleged were the inadmissible prior statements of Mr. Smith, failing to admonish the jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and failing to conduct a preliminary *Krankel* inquiry into his allegations of ineffective assistance of counsel. *Stephens*, 2019 IL App (1st) 161417-U, ¶ 35. We rejected Mr. Stephens's claims of trial error based on the admission of Mr. Smith's prior statements and the jury admonishments. *Id.* ¶¶ 35-55. But we agreed that the trial court had erred by not conducting any sort of preliminary *Krankel* inquiry, and remanded the matter for the limited purpose of allowing the trial court to do so. *Id.* ¶¶ 56-59.

¶ 12    The trial court held the *Krankel* hearing on October 22, 2020. The court began by asking Mr. Stephens "what [his] complaints were" about his trial lawyer's representation of him. Mr. Stephens told the court that he had wanted a bench trial, not a jury trial, and had asked his lawyer "for certain motions be put [*sic*], wasn't none of that pretty much done." The court asked Mr. Stephens to clarify which motions he had asked his counsel to file, and the following exchange occurred:

> "[MR. STEPHENS]: A motion for the other seven people that was in the house; second degree, if that was even on the table; or—

THE COURT: When you say 'other seven people in the house,' you wanted them to testify as witnesses?

[MR. STEPHENS]: Witnesses or why they weren't on the stand to corroborate that there wasn't no altercation or none of that, or I could have been one of the seven people that left with the five people that—with the seven that was in the house. One of the witnesses, Cornell Ward *** said that six or seven people was in and out, and then two or three people had left. So I wanted the other seven people to explain to them that I wasn't there.

And then secondly—

THE COURT: Hold on. Hold on. I'm trying to remember. Did you testify at your trial?"

¶ 13    Mr. Stephens explained that although he had wanted to testify at trial, his attorney had told him not to. At the court's prompting, however, Mr. Stephens acknowledged that he had been informed that it was solely his decision as to whether he testified or not, and he told the court he did not want to testify. The court then asked Mr. Stephens what he would have testified to, and Mr. Stephens responded:

"[MR. STEPHENS]: I would have gotten on the stand and tell them what was going on in the vicinity of the house that we was allegedly in, it was a drug house.

THE COURT: Were you in the house? Were you there?

[MR. STEPHENS]: Yes, I was there.

THE COURT: Okay. And what did you want to tell the jury that they didn't hear that they should have heard if you were called as a witness on your own behalf?

[MR. STEPHENS]: What I wanted to tell the jury was I did not do the murder. We

was selling drugs, someone came in and pretty much robbed us, and I got up out of there, and that's my frame I had.

THE COURT: Do you know who did the murder?

[MR. STEPHENS]: Yes.

THE COURT: Who were you going to tell the jury did the murder since you know who it was? Who were you going to tell them? The lawyers would have asked that question.

[MR. STEPHENS]: My uncle did it.

THE COURT: Say what?

[MR. STEPHENS]: My uncle did the murder.

THE COURT: What's that person's name?

[MR. STEPHENS]: Rondell Smith.

When I jumped out the window—because I didn't know who it was at first and found out that it was Rondell Smith that done the murder."

¶ 14    Mr. Stephens also discussed his desire at trial to have a second degree murder instruction, though he maintained he did not shoot anyone, and the judge explained that a second degree murder instruction would only be appropriate if he had shot someone but "there was a circumstance that would have made it second degree instead of first-degree murder."

¶ 15    The court then gave Mr. Stephens's trial attorney, Kelly McCarthy, an opportunity to speak. Ms. McCarthy told the judge that she remembered having "many, many conversations about trial strategy leading up to the jury trial" with Mr. Stephens. Ms. McCarthy said that she "made very clear" that the decision whether to testify was Mr. Stephens's, though she did recommend a jury trial instead of a bench trial "based on the evidence that would be coming out at trial." Ms. McCarthy explained that to her Mr. Stephens "ha[d] always indicated that he was there *** but he

did not participate in the shooting; that he knew who did it," but was "never willing to tell [her] who the real shooter was." The judge asked Ms. McCarthy how many witnesses identified Mr. Stephens at trial, and she responded:

"MS. McCARTHY: Judge, off my memory, there was several—there was at least one witness that saw him coming out of the house, they testified they saw him leaving the home. There was—I want to say there was at least four or five witnesses that testified, they were not all eyewitnesses. There was some testimony of statements that he made as well as seeing him after the fact and statements that he made that was alleged that he made some time later when he was in another state, I want to say it was Minnesota.

THE COURT: When you say 'statements,' there was third-party admissions?

MS. McCARTHY: Yes. There was third-party statements from people that allegedly observed Mr. Stephens with a bag that held a gun, and there was some statements about—that he made that he had to shoot someone. So there was some third-party statements as well as the person who said they saw him leaving the home after the shooting.

THE COURT: All right. Mr. Stephens, anything else you want to tell me about what Ms. McCarthy did wrong or didn't do?

[MR. STEPHENS]: In my transcripts, there was never no bag, so none of that occurred. And the third-party was hearsay, that's what she just kept telling me, and it was supposed to be two people, but one person was in and out of the house, and the second person was from the front to the back of the house. Other than that, there was no one that ever seen me or supposedly allegedly said I shot anyone besides the person that done it.

THE COURT: Ms. McCarthy, was this a case that—was the gun ever recovered in this case?

7

MS. McCARTHY: I don't believe so, Judge.

[MR. STEPHENS]: No.

THE COURT: So it was a circumstantial evidence case?

MS. McCARTHY: It was.

THE COURT: With statements, with third-party admissions?

MS. McCARTHY: Yes."

¶ 16    The court asked Mr. Stephens if he had anything to add, and Mr. Stephens said he did not.

¶ 17    In its ruling, the court noted that it had had no indication that Mr. Stephens had any desire to have a bench trial instead, then added, "[f]rankly, I think it's probably just as well because the evidence did—as I recall, it was substantial enough that I would have found him just as the jury did." The trial judge also said that he and Mr. Stephens had discussed Mr. Stephens's right to testify on his own behalf, then said, "I'm not blaming his lawyer because he followed her advice and now he has regrets." The judge also discussed Mr. Stephens's reluctance to name the "actual shooter," so he believed Ms. McCarthy's statement that Mr. Stephens had been reluctant to share that information with her. Finally, the judge found that a second-degree murder instruction would not apply in Mr. Stephens's case, particularly where if Mr. Stephens had testified, he would have said he did not shoot anyone. The judge concluded by saying, "as I look at all of his claims, I'm not finding that there's any grounds for relief under People versus Krankel."

¶ 18    This appeal followed.

¶ 19                                    II. JURISDICTION

¶ 20    The *Krankel* hearing was completed on October 22, 2020, and Mr. Stephens timely filed his notice of appeal on November 18, 2020. This court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court

Rules 603 and 606, governing appeals from final judgments of conviction in criminal cases (Ill. S. Ct. R. 603 (eff. Feb. 6, 2013), R. 606 (eff. Dec. 11, 2014)).

¶ 21                                    III. ANALYSIS

¶ 22    On appeal, Mr. Stephens argues that the trial court failed to conduct a proper *Krankel* inquiry because it did not investigate further Mr. Stephens's claim that his trial counsel was ineffective for not investigating or calling seven witnesses who were present at the victim's home the day the victim was shot and killed. Mr. Stephens argues that it is of "no consequence" that the trial judge followed up on his other claims of ineffective assistance because, in his view, he did not adequately inquire into this particular claim. Thus, our focus on appeal is on the trial court's treatment of this claim.

¶ 23    "Through *People v. Krankel* and its progeny, the Illinois Supreme Court has provided our trial courts with a clear blueprint for the handling of posttrial *pro se* claims of ineffective assistance of counsel." *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 70. The trial court must first "conduct an inquiry to examine the factual basis underlying a defendant's claim." *Id.* If a defendant's claim suggests "possible neglect of the case," then the trial court should move to the second stage of the *Krankel* proceeding, where the defendant receives new representation at an "evidentiary hearing." (Internal quotation marks omitted.) *Id.* ¶ 85. But "[i]f [a] trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). "A claim lacks merit if it is conclusory, misleading, or legally immaterial[,] or do[es] not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." (Internal quotation marks omitted.) *People v. Robinson*, 2017 IL App (1st) 161595, ¶ 84.

¶ 24    How we review an appellate claim based on *Krankel* depends on "whether the trial court

9

employed the proper procedure and whether it made a determination on the merits." *Robinson*, 2017 IL App (1st) 161595, ¶ 87. We review the procedure used by the court *de novo*, and if the procedure used was somehow erroneous, "we will reverse the outcome of the inquiry, unless the error was harmless beyond a reasonable doubt." *Id.* In contrast, if the procedure used by the trial court was proper and it reached the merits of the defendant's *Krankel* claim, we will only reverse if that decision was manifestly erroneous. *Id.* ¶ 90.

¶ 25    Here, Mr. Stephens attacks the procedure the trial court used in conducting the *Krankel* inquiry, based on the court's failure to ask Mr. Stephens's trial counsel questions about her "failing to call on several witnesses who were at [Mr. Coleman's] home on the day [Mr. Coleman] was shot and killed." We find the trial court's procedure in conducting the *Krankel* inquiry was proper and affirm the dismissal of Mr. Stephens's claims of ineffective assistance.

¶ 26    As our supreme court has explained:

> "The purpose of the preliminary inquiry is to ascertain the underlying factual basis for the ineffective assistance claim and to afford a defendant an opportunity to explain and support his claim. In this way, the circuit court will have the necessary information to determine whether new counsel should be appointed to argue the claim of ineffective assistance of counsel." *People v. Ayres*, 2017 IL 120071, ¶ 24.

¶ 27    At this stage, the "method of inquiry" used by the trial court "is somewhat flexible." *People v. Fields*, 2013 IL App (2d) 120945, ¶ 40. Our supreme court has stated that "we adhere to a case-by-case, fact-specific examination, driven by the record." *People v. Roddis*, 2020 IL 124352, ¶ 64. It has also made clear that "[a] brief discussion between the trial court and the defendant may be sufficient," that "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is effective and usually

necessary," and that "the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79.

¶ 28    Mr. Stephens told the trial court that he had asked his trial counsel for "[a] motion for the seven other people that was in the house." The court asked Mr. Stephens to clarify whether he wanted those seven people to testify, to which Mr. Stephens responded that he wanted them to testify "that there wasn't no altercation or none of that, or I *could have* been one of the people that left with the five people that—with the seven that was in the house." (Emphasis added).

¶ 29    Mr. Stephens's claim about these seven potential witnesses is vague and conclusory. Mr. Stephens did not present the names of the people who were at the house or any definite details that any of those people could have provided. He suggested only that a witness or witnesses *might* have testified that Mr. Stephens "could have" been one of the people that left Mr. Coleman's house before the shooting occurred.

¶ 30    Additionally, Mr. Stephens's claim that one of those witnesses might have testified that he left before the shooting is undermined by the evidence at trial. Bernard Franklin testified that at least five people were at Mr. Coleman's house the day of the shooting, and that a few of them left before the gunshot, but he made clear in his testimony that the man he identified as Ms. Stephens left shortly *after* the gunshot was heard.

¶ 31    In short, viewing Mr. Stephens's claims in light of the trial evidence, the claims did "not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." (Internal quotation marks omitted.) *Robinson*, 2017 IL App (1st) 161595, ¶ 84. The failure to bring such a claim to the court's attention relieves the court of any obligation to proceed beyond the first stage of a *Krankel* hearing. *Id.,* ¶85.

¶ 32    It is true that the trial court did not specifically ask trial counsel about whether she investigated the other people who had been in the house as potential witnesses. But "colloquy with trial counsel is not a necessity if the trial court can otherwise determine that [the] defendant's claim does not warrant the appointment of new counsel." *People v. McCarter*, 385 Ill. App. 3d 919, 942 (2008). Counsel told the trial judge that she and Mr. Stephens "had many, many conversations about trial strategy leading up to the jury trial." "[T]he decision whether to call a certain witness for the defense is a matter of trial strategy, left to the discretion of counsel after consultation with the defendant." *People v. Peterson*, 2017 IL 120331, ¶ 80. Thus, the trial court's questioning of Mr. Stephens and his trial counsel was a sufficient basis on which the court could conclude the *Krankel* hearing with respect to trial counsel's investigation of witnesses, without proceeding beyond the first stage.

¶ 33    In his brief, Mr. Stephens argues that "[t]he trial court must conduct a thorough examination of each claim and 'must be able to consider the merits in their entirety' if it is to deny further *Krankel* relief based on a finding that the claims lack legal merit" (quoting *Roddis*, 2020 IL 124352, ¶ 61). This quote from *Roddis* has been taken out of context. As our supreme court made clear in *Moore*, "[a] brief discussion between the trial court and the defendant may be sufficient." 207 Ill. 2d at 78. The issue before the supreme court in *Roddis* was whether a trial court is permitted to address the legal in addition to the factual merits of a defendant's *pro se* ineffective assistance claims. *Roddis*, 2020 IL 124352, ¶ 31. The supreme court ultimately answered the question in the affirmative, and it is in *this* context that the court then stated, "even in preliminary *Krankel* inquiries, a trial court must be able to consider the merits *in their entirety* when determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel." (Emphasis in original.) *Id.* ¶ 61. Nothing in *Roddis* supports Mr. Stephens's argument

that the trial court is obligated to make a detailed inquiry into every claim of ineffective assistance put forth by the defendant during a preliminary inquiry.

¶ 34    Mr. Stephens also relies on *People v. Maya*, 2019 IL App (3d) 180275, in support of his argument, but that case has little relevance to this one. The issue before the court in *Maya* was the *Krankel* finding rather than, as here, the *Krankel* procedure. The defendant argued that the trial court's determination, after the *Krankel* inquiry, that the defendant failed to show possible neglect of his case by his trial counsel was manifestly erroneous. *Id.* ¶¶ 20, 32. In *Maya*, the defendant told the court that he had told his trial counsel that one of the alternate jurors—who was ultimately seated on the jury that found the defendant guilty—was a correctional officer at the facility where the defendant was detained with whom the defendant had been in " 'several confrontations,' " and who had "told other inmates details of the defendant's case to induce those inmates to harass the defendant." *Id.* ¶ 32. The *Maya* court observed that, "[t]roublingly, *** the court asked counsel no questions relating to the defendant's jury claim, and counsel did not otherwise offer any explanation." *Id.* ¶ 34. The significance of this observation, which is what Mr. Stephens relies on here, was to highlight that the defendant's serious allegations against counsel were unrebutted. *Id.* The *Maya* court observed that "[i]f the defendant's factual allegations [we]re true, the seating of [the correctional officer] on the jury that eventually found the defendant guilty shock[ed] the conscience." *Id.* ¶35. It concluded:

"Trial before a biased jury is structural error and requires automatic reversal [Citation.] It is difficult to discern any potential strategy defense counsel might have for allowing a juror with demonstrated bias toward his client to serve on a jury.

*** [G]iven the serious nature of the [defendant's] allegations, the absence of any explanation from defense counsel as to the facts and circumstances surrounding the

allegations, and the fact that the record shows that [the juror] was a Will County correctional officer, we hold that the circuit court's determination that the defendant failed to demonstrate *possible* neglect of the case was manifestly erroneous." (Emphasis in original.) *Id.* ¶¶ 35-36.

¶ 35    In contrast to the very specific allegations in *Maya,* Mr. Stephens's allegations with respect to counsel's failure to investigate the other people at Mr. Coleman's house as potential witnesses were vague and conclusory. And in further contrast to *Maya*, where the defendant's claim raised a structural error, Mr. Stephens's claim deals with the decision to call witnesses, an area where trial strategy is generally deferred to. *Maya* is quite inapposite.

¶ 36    In sum, we reject Mr. Stephens's argument that *Krankel* requires a trial court to conduct a detailed preliminary examination into each ineffective assistance claim a defendant raises. We do not find that the procedure the trial court used in conducting the *Krankel* inquiry in this case was improper.

¶ 37                                  VI. CONCLUSION

¶ 38    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 39    Affirmed.